UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| TODD ADAM GAMACHE, | ) | |
| --- | --- | --- |
| Plaintiff | ) | |
| v. | ) | 2:11-cv-111-DBH |
| JEFFREY MERRILL, et al., | ) | |
| Defendants | ) | |

## RECOMMENDED DECISION

According to the amended complaint's allegations, Todd Gamache was stabbed by a fellow prisoner while in protective custody at the Maine State Prison. Gamache alleges that prison officials housed him in protective custody with another prisoner who had connections to the Aryan Brotherhood when they knew or should have known that Gamache's safety could be seriously threatened by anyone associated with that organization. Gamache's amended complaint names fourteen separate defendants and is deficient in setting forth the factual basis for some of the individuals being named as party defendants. However, his theory appears to be that all of the named defendants were deliberately indifferent to a substantial risk that Gamache would suffer serious harm at the hands of a fellow inmate. I now recommend that the motion to dismiss be granted.

### Amended Complaint Allegations

Gamache, who is currently incarcerated at the Maine Correctional Center in Windham, Maine (Am. Compl. ¶ 1), sets forth in properly numbered paragraphs the names and employment capacities of each of the defendants (id. ¶¶ 2- 15). The defendants are identified as follows: (1) Jeffrey Merrill, Warden for the Maine State Prison; (2) Martin Magnusson, Commissioner of Corrections; (3) Charlie Charlton, Gamache's caseworker and Correctional Unit Manager of the

1

close custody unit at the prison; (4) Scott McCaffery, Director of Classifications; (5) Starbird, Correctional Unit Manager of the Special Management Unit; (6) Dwight Fowles, correction unit manager and Deputy Warden; (7) S. Drake, correctional captain, correctional unit manager, and grievance review officer; (8) Randy Thomas, correctional care treatment worker; (9) Riley, Deputy Warden; (10) Sergeant Brownell, correctional sergeant; (11) Sergeant Fries, correctional sergeant; (12) Sergeant Vigue, correctional sergeant; (13) Sergeant Doyal, correctional sergeant; and (14) Sergeant Parsons, correctional sergeant. Following his introductory paragraphs, Gamache sets forth his jurisdictional statements (id. ¶¶ 16 – 18) and then launches into a description of the events giving rise to this lawsuit. Of the fourteen named defendants, six -- Merrill, McCaffrey, Starbird, Brownell, Vigue, and Doyal -- are only mentioned in the introductory paragraphs. The amended complaint is devoid of any substantive allegations related to their conduct surrounding this incident.

In 2008 Gamache pled guilty in the state court to a charge relating to the death of an eight month old girl. He was in the Androscoggin County Jail awaiting sentencing in February 2008. (Id. ¶¶ 19-20.) All told, Gamache spent thirteen months in the county jail and he was never threatened nor approached in any way during his stay there. (Id. ¶ 21.) On April 29, 2008, Gamache's attorney's secretary received a call from an anonymous female caller who insisted that her call be forwarded to the attorney. The attorney accepted the call and the anonymous female caller reported to him that Gamache's life was in danger because the Aryan Brotherhood had stated that once Gamache entered the Maine State Prison he would be killed. (Id. ¶¶ 22 – 25.) A Maine State police detective was informed of the call and investigated the matter, but was unable to immediately trace the origin of the call. (Id. ¶¶ 26 – 33.) He eventually learned the call came from a pay phone located at a local CVS store in Marlborough, Massachusetts. (Id.

¶ 46.) The state police detective learned from an Androscoggin jail guard that Gamache was worried about going to the Maine State Prison following his sentencing (id. ¶ 37) and the detective informed the officials at the prison of the threats to Gamache (id. ¶¶ 39, 42, 47).

On May 1, 2008, Gamache arrived at the prison to commence serving his sentence of eighteen years with all but fourteen years suspended, followed by four years of probation. (Id. ¶¶ 40, 45.) Gamache's attorney assured him that all the proper officials were working to resolve the situation surrounding his safety concerns. (Id. ¶¶ 41, 43, 49.) Upon his arrival at the prison Gamache was placed on "AD-SEG status and placed on the "Lower El," the prison's highest level of secure cells." (Id. ¶ 45.)

In May 2008, Gamache had an encounter with one of the defendants, Sergeant Fries, who advised him that he should put in for an out-of-state transfer because of "that baby you killed"; Gamache felt harassed and intimidated by Fries and failed to follow through with his grievance against him because of the intimidation. (Id. ¶ 51.)

Gamache was unwilling to go into the prison's protective custody unit and applied multiple times to be transferred to the Maine Correctional Center in Windham because that facility did not tolerate gang activity and violence. (Id. ¶ 52.) Gamache remained in the "Lower El" through June 2008 and experienced difficult conditions during that time, including limited phone calls and recreational opportunities. The conditions took a toll on his mental health. (Id. ¶¶ 53 – 54, 58 – 59.) Approximately one month later, in June 2008, Gamache was moved to the "Upper EL" which is a less restricted area, but still provided few opportunities for recreation. (Id. ¶ 62.) The conditions remained harsh. (Id. ¶¶ 55-58.)

In early June 2008, Gamache received communications from his attorney regarding the investigation into the death threats. (Id. ¶¶ 60-61.) In July 2008, Gamache was placed in the

Protective Custody Unit (id. ¶ 65), despite having expressed his misgivings about this placement. He was told by a caseworker to wait seven months and then they would try to put him into the general population. (Id. ¶ 66.) Gamache was told that officials would investigate any problems that might arise. Leduc, the individual who ultimately stabbed Gamache, was in the protective unit when this investigation was pursued, but "no flags seemed to arise." (Id. ¶ 64.) Gamache spent eleven months in the protective custody unit and repeatedly expressed anxiety to his caseworker, mental health worker, and Unit Manager, Charlie Charlton. (Id. ¶¶ 67 – 70.)

In paragraph seventy-one of his complaint, Gamache relates a lengthy explanation of a noncontact visit he had with his father in late 2008. Gamache recounts that an Officer Hubbard allowed him to walk unescorted across the prison, through areas where general population prisoners were congregated, back to his protective custody unit. Gamache explains that according to prison regulations he was to be in the company of a guard at all times, but that Hubbard ordered him to return to his unit and it would have been a disciplinary infraction to disobey the direct order of a guard. Nothing happened to Gamache as a result of this breach of procedure regarding his safety.

Gamache held a paid position working in the kitchen for approximately six months. (Id. ¶ 72.) During the time period between July 2008 and June 3, 2009, Gamache witnessed inmate Leduc housed in the protective custody on three separate occasions. Although the unit manager is required to conduct a review of the unit population for possible threats to inmate safety every time an inmate returns to the unit, nothing was ever identified in relationship to Leduc's presence. (Id. ¶ 73.) In 2009 another inmate overheard Leduc tell Sergeant Parsons that he wanted to return to segregation "or there would be some sort of actions taken into his hands." (Id. ¶ 74.) Nothing was done by Parsons in response to this statement. (Id.) On June 2, 2009,

Gamache was asked to write a letter explaining why he believed that Maine Correctional Center would be a safe placement for him and the letter was received by Unit Manager Charlton and Deputy Warden Riley. (See App. 11, Doc. No.19-12.)

On June 3, 2009, Gamache was stabbed in the back four times while in his cell. The assailant was Daniel Leduc, who had past Aryan Brotherhood connections. (Am. Compl. ¶ 76.) Leduc was housed in the protective custody unit at the time. (Id. ¶ 77.) Gamache was alone and unprotected in his cell when Leduc entered and stabbed him, then quickly left, closing the cell door. (Id. ¶ 78.) Gamache had difficulty getting the guard's attention in order to get help. (Id. ¶ 79.) Eventually medical help arrived and Gamache was transported to Penobscot Bay Medical Center. (Id. ¶¶ 80-82.) He received medical treatment and returned to the prison the same day. (Id. ¶¶ 83-85.)

Upon his return to the prison, Gamache was placed in AD-SEG and an investigation was conducted regarding the stabbing. (Id. ¶¶ 86, 89.) According to Gamache, Daniel Leduc was a "known affiliate to threaten gang the Aryan Brotherhood." (Id. ¶ 87.) Gamache remained in segregation until a safe alternative became available. (Id. ¶ 88.) His segregation status caused Gamache to lose his income from working in the kitchen and certain good time allowances. (Id. ¶ 90.) Charlton responded to Gamache's grievance request regarding a transfer to Maine Correctional Center by telling him to wait until the investigation was complete and returning the grievance to him, unsigned, in contravention of prison policy. (Id. ¶ 91.) Gamache then sent grievances to Commissioner Magnusson, the governor, and a United States Senator. (Id. ¶ 92.)

Gamache experienced recurring nightmares, nervousness and other mental health concerns. (Id. ¶ 93.) Gamache expressed his concerns to mental health worker Barbera and wrote unit manager Dwight Fowles regarding having lost his privileges. (Id. ¶¶ 96-97.) On June

12, June 19, and June 26, 2009, Gamache's AD-SEG status was reviewed and extended for another seven days on each occasion. (Id. ¶¶ 100, 104, 108.) On July 1, 2009, Gamache filed another grievance with unit manager Dwight Fowles (id. ¶ 109) and on July 3, 2009, a month after the stabbing, Gamache was finally sent to the Maine Correctional Center in Windham (id. ¶ 110). After approximately three and one half weeks Gamache was returned to the Maine State Prison without explanation, but in August 2009, he was returned to Windham, where he has remained. (Id. ¶¶ 111-112.)

On August 9, 2009, Gamache filed his third grievance regarding this issue because he had never heard back from Fowles regarding the second grievance and the first grievance had been returned unsigned by Charlton. (Id. ¶ 113.) Captain Drake denied the third grievance as untimely. (Id. ¶ 114.) On August 18, 2009, a representative of the district attorney's office attempted to speak with Gamache, but on advice of his then counsel, Gamache refused to speak with her. (Id. ¶ 115.)

Gamache's amended complaint then sets forth five counts: Count I alleging "failure to protect"; Count II, cruel and unusual punishment; Count III, due process violations; Count IV, procedural due process violations; and Count V, substantive due process violations.

## Motion to Dismiss Standard

Pursuant to Federal Rules of Civil Procedure 12(b)(6), a claim or complaint may be dismissed if it fails to state a claim upon which relief can be granted. In Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937 (2009) the United States Supreme Court summarized: "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 1949. It reiterated, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544 , 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

Under Iqbal to survive a motion to dismiss for failure to state a 42 U.S.C. § 1983 claim a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id. at 1949 (quoting Twombly, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. See Twombly, 550 U.S. at 556. Adding a conclusory assertion of a constitutional violation "'will not do.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).

Given Gamache's pro se status, his pleading in a case of this nature should be given special consideration. In Hasenfus v. LaJeunesse the First Circuit noted that "a set of unique rules has developed" apropos "incarcerated prisoners or involuntarily committed mental patients" in cases alleging a failure to intervene to prevent harm by a private actor. 175 F.3d 68, 71 (1st Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97 (1976) and Youngberg v. Romeo, 457 U.S. 307 (1982)). It opined:

> In such cases, failures to act- e.g., to provide medical care or to stop one inmate from assaulting another-may comprise a due process or other constitutional violation because the state-imposed circumstance of confinement prevents such individuals from helping themselves. Liability then arises under section 1983 if the plaintiff shows that the inaction was malicious or reflected the official's "deliberate indifference" to the welfare of the prisoner or inmate. Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Id. (footnote omitted).[1]

In this case Gamache has not presented any allegations that these state actors were aware of an actual serious risk of harm, let alone that they deliberately were indifferent to the risk. In fact, the allegations he has made suggest that they did try to secure him protection based upon nothing more than vague, anonymous threats. They were not deliberately indifferent to those threats. Viewing the allegations in the light most favorable to Gamache, one prison guard was aware that Leduc, the stabber, had expressed an ambiguous general verbal threat of harm regarding the unit where he was housed. There is nothing in the allegations to support an inference that anyone knew that Leduc posed a specific risk of harm to Gamache. See Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) ("Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists-and the prison official must also "draw that inference." Farmer, 511 U.S. at 837."). In fact, Leduc had been housed in the same unit on prior occasions without incident, even though Gamache was also in the unit at the time. Gamache also notes that a prison guard, Hubbard, who is not a defendant, negligently disobeyed prison regulations and allowed Gamache to walk unescorted across the prison yard after a visit with his father. While Hubbard's alleged negligence *could* have resulted in injury to Gamache, nothing actually happened. That incident does not support an inference that these named defendants were deliberately indifferent to a risk of harm to Gamache.

The crux of this case is that Gamache wanted to be placed at a facility other than the Maine State Prison from the time he began serving his sentence. For whatever reason, prison officials did not facilitate his move to the other prison until after the stabbing. However, they did

---

[1] The Panel noted: "In the case of convicted prisoners, the Eighth Amendment is usually the constitutional provision referred to by the courts; but the substance of the protection is the same. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 243-45 (1983)." Id. at 71 n.1.

take steps, albeit ultimately unsuccessful, to protect Gamache. "'[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away persons committed by the courts; nor do individual guards have any control over crowding and other systemic circumstances.'" Grieveson v. Anderson, 538 F.3d 763, 777 (7th Cir. 2008) (quoting Riccardo v. Rausch, 375 F.3d 521, 525 (7th Cir.2004) and citing United States v. Tokash, 282 F.3d 962, 970 (7th Cir.2002)). Even with the best of intentions, prison officials cannot guarantee safety. In this case the allegations do not support any inference that they were deliberately indifferent to Gamache's plight.

## Conclusion

Based upon the foregoing, I recommend the motion to dismiss be granted.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 6, 2011